## AFFIDAVIT IN SUPPORT OF
## SEARCH WARRANT APPLICATION

I, Christopher J. White, being first duly sworn, hereby state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with the account **yijun.ruan@gmail.com** that is stored at premises controlled by Google, an email provider headquartered at Mountain View, California.

2. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

3. I am a Special Agent with the Federal Bureau of Investigation and have been so employed since January 19, 2010. I am currently assigned to the Portland, Maine Resident Agency. My current assignment includes national security investigations. Throughout my career I have been involved in various investigations that have included economic espionage, theft of trade secrets, fraud, online threats, violent crime and other counterintelligence and counterterrorism investigations.

4. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1001 (concealing a material fact in a matter within the jurisdiction of the United States government) and 18 U.S.C.

§ 1343 (wire fraud) have been committed by Yijun Ruan, the user of **yijun.ruan@gmail.com**. There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## JURISDICTION

5. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6. The Jackson Laboratory (JAX) is an independent nonprofit biomedical research laboratory based in Bar Harbor, Maine. In addition to its Bar Harbor headquarters, JAX has several other locations, including a genomic medicine institute on the campus of the University of Connecticut Health Center in Farmington, Connecticut.

7. Yijun Ruan, Ph.D., is the Florine Deschenes Roux Chair and Director of Genome Sciences at the Jackson Laboratory for Genomic Medicine in Farmington, Connecticut. Ruan has been employed by JAX since September 2012. According to Ruan's biography on the JAX website, www.jax.org, his primary interest is to "elucidate the structures and dynamics of all functional DNA elements in complex genomes through DNA sequencing analysis of genetic variations in genomes and transcriptomes." Ruan received his B.S. and M.S. degrees in microbiology from the Huazhong Agricultural University (HZAU) in Wuhan, China. He received his Ph.D. in Plant Molecular Biology from the University of Maryland.

8. A component of the United States Department of Health and Human Services, the National Institutes of Health (NIH) is a government agency responsible for biomedical and

public health research. NIH, which is headquartered in Bethesda, Maryland, is made up of 27 different components called Institutes and Centers. These include the National Cancer Institute, the National Human Genome Research Institute, and the National Institutes of Diabetes and Digestion and Kidney Diseases.

9. NIH conducts its own scientific research through an intramural research program, and provides major biomedical research funding to non-NIH research facilities through an extramural research program. Among the non-NIH entities that receive funding through NIH's extramural research program are nonprofit research laboratories such as JAX.

10. In order to receive NIH funding, non-NIH research institutions must submit a detailed application describing, among other things, the purpose and scope of the proposed research, the amount of funding requested and how the funding will be used. Both during the application process and periodically after an award is made, the institution must also disclose to NIH all foreign collaboration and foreign sources of research support, including, but not limited to, research grants, cooperative agreements, contracts and/or institutional awards. Additionally, NIH requires research institutions to identify and disclose to NIH significant (typically greater than $5,000) financial conflicts of interest by investigators (that is, the person or persons responsible for the design, conduct and reporting of research), including those related to funds received from a foreign institution of higher education or the government of another country.

11. Although it is the research institution itself that submits the grant application and all other grant-related disclosures to NIH, the individual investigator(s) must certify to the institution and NIH that the information contained in grant applications, post-award submissions and all other grant-related filings is accurate and complete, and also acknowledge that any false, fictitious or fraudulent statements or claims made to NIH may subject to the investigator to

criminal, civil and/or administrative penalties. Section 2.3.7.6 of the NIH Grants Policy Statement, which describes the terms and conditions of NIH grant awards, requires the applicant organization to secure and retain a unique signature and dated assurance containing such certifications from the Principal Investigator (PI) for each submitted application, prior to submitting an application to the NIH. This assurance must be available to the NIH, or other authorized Department of Health and Human Services or Federal officials upon request.

12. According to publicly available information on the NIH website, between Fiscal Year 2014 and Fiscal Year 2020, Yijun Ruan was the PI on 17 projects that received over $15 million in NIH grant funding, as detailed in the following table:

| Fiscal Year | # of Awards | Funding |
| --- | --- | --- |
| 2020 | 2 | $2,816,022 |
| 2019 | 2 | $2,624,640 |
| 2018 | 3 | $2,916,589 |
| 2017 | 3 | $2,677,903 |
| 2016 | 3 | $1,375,942 |
| 2015 | 3 | $2,264,325 |
| 2014 | 1 | $722,322 |
| **TOTAL** | **17** | **$15,397,743** |

13. The "Chinese Talent Programs" refer collectively to various plans designed by the Chinese Government to attract, recruit, and cultivate high-level scientific talent in furtherance of China's scientific development, economic prosperity, and national security. Implemented in 2008, the "Thousand Talents Plan" is the most prominent Chinese talent recruitment plan designed by the Chinese Government to incentivize individuals engaged in research and

4

development in the United States to transmit the knowledge and research they gain here to China in exchange for salaries, research funding, lab space, honorary titles and other incentives. The Thousand Talents Plan is designed to lure both Chinese overseas talent and foreign experts to bring their knowledge and experience to China. The so-called "World Recruitment Plan of Renowned Experts in China" is part of the Thousand Talents Plan. The Chinese Talent Programs have rewarded individuals for stealing proprietary information and violating export controls.

### RUAN'S AFFILIATION WITH HUAZHONG AGRICULTURAL UNIVERSITY AND CHINA'S THOUSAND TALENTS PLAN

14. Information provided by JAX indicates that Ruan received a Thousand Talents Program appointment from HZAU in September 2011, when he was employed by the Genome Institute of Singapore (GIS), and maintained a relationship with HZAU until at least December 2018, while employed by JAX.

15. Specifically, JAX provided a translation of an email sent to Ruan's GIS email that stated, "…[the school] agreed to proceed with the appointment based on this contact, with an appointment ceremony planned for the afternoon of September 9." Provided with the email was a translation of a "Thousand Talents Program…Appointment Contract" between HZAU and Ruan. The contract provided that Ruan would be appointed a "Distinguished Professor" by HZAU for a term of six years, with July 2011 to June 2014 as a transition period, and July 2014 to June 2017 as "the official appointment period." The contract noted that he would receive 100,000RMB (over $15,000 USD at current conversion) per month pre-tax. The contract also provided that HZAU would provide 150-square-meter on-campus housing.

16. A translation of a February 2012 email sent to Ruan's GIS email from HZAU provided that a "Distinguished Expert job allowance" had been credited to Ruan's "salary card."

The translation provided that he was to receive 95,150.00RMB after 4,850.00RMB tax withholding for a total of 100,000.00RMB.

17. A translation of a later February 2012 email sent to Ruan's GIS email from HZAU provided that his "Xiyuan house in [HZAU] has finished, and the curtains will be installed around March 6." It additionally noted that "the 1 million RMB subsidy granted by the state to the Thousand Talents Program enrollees has been transferred to your Bank of China card." One million RMB is over $150,000 USD at current conversion.

18. A translation of a December 2014 email sent to an HZAU email address and copied to Ruan's **yijun.ruan@gmail.com** email address contained an attachment titled "Statistics chart on expert's personal report to duty time – Ruan Yijun.doc." The attachment provided a "Work content" breakdown for Ruan. For example, the chart provided that between February 19, 2014, and March 9, 2014, Ruan spent 18 days at an Asian genome conference in Shanghai; that between June 5, 2014, and June 18, 2014, he "return[ed] to school to discuss topics, write application, and provide guidance to graduate students"; and that between October 17, 2014, and October 25, 2014, he spent eight days "to discuss topics and provide guidance to students."

19. JAX also provided a translation of an email chain between HZAU and Ruan's Gmail account between December 25, 2015, and January 5, 2016. The initial email from HZAU stated that Thousand Talent Program Distinguished Experts were "paid by HZAU." Additionally, the email stated that, "Based on the most recent financial regulations, allowance must be paid to personal domestic bank account" and suggested that "payment of allowance personal bank account that has been approved by the school's financial department, Bank of China HZAU Branch." Later in the email chain, Ruan asked, "Can you send me the soft copy of

6

the 1K talent certification?" Provided with the email chain was an "Expert On Duty Situation Registration Form" for Ruan. The form provided the "Work Details" for Ruan. For example, the form provided that for 18 days between January 8, 2015, and February 4, 2015, he "Discuss[ed] plant 3D genomics project with HZAU State Key Lab of Crop Genetic Improvement," "Attend[ed] Xiangshan Forum, rice 3D genomic discussion," and "Discuss[ed] project with graduate students." The form also provided that for 16 days between May 30, 2015, and June 14, 2015, he "Host[ed] and participate[d] in '2nd 3D Genomics Symposium' at HZAU," "Discuss[ed] and implement[ed] application of 3D genomics on rice, legume and animals with relevant labs at HZAU." and "Discuss[ed] project progress with graduate students." Provided with the email chain was a photograph with a translation of Ruan's "Hubei Province Distinguished Expert Certificate" bestowing upon him the "Honorary Title of Hubei Province Distinguished Expert." Lastly provided with the email chain was a translation of Ruan's "2015 Annual Work Summary." The summary provided that he "Actively promote[d] the start of 3D genomics in China," "Actively promote[d] the application of 3D genomics" in HZAU, and cultivated "young HZAU professors," noting that "Prof. CAO Jianhua completed on year of training at" JAX.

20.     JAX also provided a translation of an email chain between HZAU and Ruan's Gmail on December 22, 2016. The initial email from HZAU provided that Thousand Talent Program "specially-appointed experts" were "paid at HZAU." Additionally, the email provided that "based on the financial regulations, and the allowance must be paid to personal domestic bank account in China" and recommended that "the personal account for payment is approved by the school's financial department, is from the Bank of China" HZAU "sub-branch." Provided with the email chain was Ruan's "Expert Report to Duty Registration Form." The form provided

7

that for five days between October 21, 2016, and October 26, 2016, Ruan "Organize[d] and host[ed] the third 3D Genomics Symposium."

21. JAX also provided a translation of an email chain between HZAU and Ruan's Gmail between November 28, 2017, and December 5, 2017. The initial email from HZAU provided that the "Annual work summary of the expert" needed to be submitted and that payment "For full-time experts" "is issued directly to the Bank of China account associated with wages, and non-full-time experts must provide a bank account in China." Provided with the email chain was Ruan's "Expert Report to Duty Registration Form." The form provided that for four days between January 1, 2017, and January 4, 2017, Ruan "Provide[d] guidance to students, academic exchange" and for six days between November 11, 2017, and November 15, 2017, he "Organize[d] and host[ed] the fourth International 3D Genomics Symposium."

22. JAX also provided a translation of an email chain between HZAU and Ruan's Gmail between December 23, 2018, and December 24, 2018. The initial email from HZAU provided that the yearly work summary for experts needed to be submitted. Provided with the email chain was Ruan's "Expert On Duty Situation Registration Form." The form noted that for 15 days between June 1, 2018, and June 15, 2018, Ruan "Discuss[ed] pig 3D genome project, supervise[d] students and other collaborations," and for four days between October 12, 2018, and October 15, 2018, he "Organize[d] 5th International 3D Genomics Workshop, discuss[ed] pig 3D genome project and other collaborations."

### RUAN'S AFFILIATION WITH SHENZHEN PEOPLE'S HOSPITAL

23. According to the public website for the government of the city of Shenzhen, in southeastern China, Shenzhen People's Hospital (SPH) is the largest hospital in the city. Also

according to the website, it is "a modern comprehensive hospital combining medical services, teaching, scientific research and health care."

24. Information provided by JAX indicates that Ruan entered a collaborative agreement with SPH in October 2016, and maintained a relationship with the hospital until at least September 2019.

25. Specifically, JAX provided a translation of an email from early October 2016 in which Ruan's JAX email, yijun.ruan@jax.org, was cc'd. Provided with the email was an "Application Form" for "Shenzhen Introduction of High Level Medical Team." The form provided that the team name was "Ruan Yi Jun Precision Medical Team, The Jackson Laboratory, USA." The form was signed by several people and dated October 3, 2016. Provided with the email was a Chinese language and English language "Agreement on collaboration between Shenzhen People's Hospital and Professor Ruan Yijun and his Jackson Laboratory Precision medicine team." The agreement provided that it was "valid for five years and shall commence immediately after it has been signed and sealed." Ruan appeared to have signed the agreement on October 3, 2016. Also provided with the email was a table titled, "Basic Information of High Level Medical Team Members Introduced to Shenzhen." The table provided that Ruan would work in Shenzhen one month yearly.

26. JAX also provided a translation of an email sent to both Ruan's Gmail and his JAX email from an individual at SPH. The individual from SPH wrote, "The content of the application has been updated" and requested "Copies of the scientific and technological achievements of the team from 2017 to 2019 . . . ." Provided with the email were translated pages of the "Shenzhen Overseas High-level Talent Team R&D Project Feasibility study report." The report provided that Ruan was the "High-level talent team leader." The report also stated

9

that the team leader would receive 800,000 yuan (over $120,000 USD at current conversion) per year and 4 million yuan (over $600,000 USD at current conversion) in five years. Additionally, the report provided that the "total investment of the project is 42 million yuan" (over $6 million USD at current conversion). The report also provided that:

> Although a few scholars and units in China have participated in some of the international post-sequencing genome projects, there are almost no important genome projects led by Chinese scholars. In the field of genomics in the post-sequencing era, except for some local characteristics and comparative advantages, China is still in the process of tracking and catching up in the overall development. The U.S. is the world leader in human medical research, with the world's best scientific talent and resources, and it is difficult to compete with the U.S. for 3D Human Genome Project when the NIH is already one step ahead. **This project will bring in Professor Yijun Ruan, the global founder of 3D genomics, to establish a 3D genomics technology R&D and application technology platform in China, and take the lead in technology development, research on important life science mechanisms, and 3D gene technology service and industrial development. It will not only provide strong fundamental support for continued innovation in China's life sciences, clinical medicine, and biotechnology industries, but will also provide China with a world-leading opportunity in the field of clinical medical genomics, which should not be missed.** [Emphasis in original]

### RUAN'S RECEIPT OF NIH FUNDING

27. NIH provided documents for funding awarded to JAX with Ruan as the PI. He was the PI on five NIH applications from 2014 to 2020. All applications were submitted by JAX headquarters, located at 600 Main Street in Bar Harbor, Maine. The applications were submitted electronically, and therefore would have traveled via the internet from JAX in Maine to NIH.

28. As noted above, as part of the grant application process, NIH requires institutions applying for grants to provide information on other forms of support being provided to the researchers involved in a project for which NIH funds are sought. According to information provided by NIH, since October 2019, the following must be included in "Other Support" submissions:

10

> [O]ther support includes all resources made available to a researcher in support of and/or related to all of their research endeavors, regardless of whether or not they have monetary value and regardless of whether they are based at the institution the researcher identifies for the current grant. This includes resources and/or financial support from all foreign and domestic entities, including but not limited to, financial support for laboratory personnel, and provision of high-value materials that are not freely available (e.g., biologics, chemical, model systems, technology, etc.). Other support does not include training awards, prizes or gifts. Other support is requested for all individuals designated in an application as senior/key personnel-those devoting measurable effort to a project.

29. Prior to October 2019, the following was required to be included in Other Support submissions:

> Other support includes all financial resources, whether Federal, non-Federal, commercial or institutional, available in direct support of an individual's research endeavors, including but not limited to research grants, cooperative agreements, contracts, and/or institutional awards. Training awards, prizes or gifts are not included. Other support is requested for all individuals designated in an application as senior/key personnel-those devoting measurable effort to a project.

30. In June 2013, JAX submitted an application for funding administered by the National Cancer Institute, with Ruan as the PI. On March 26, 2014, JAX received a Notice of Award from NIH for the project, which was given project number NIH R01 CA186714. The project period was April 1, 2014, to March 31, 2017. Ruan's biographical sketch included in the application did not include information regarding his receipt of a China Thousand Talent Award or his ongoing relationship with HZAU. JAX submitted a "Just-in-Time" Report to NIH on January 21, 2014. A Just-in-Time Report is required to be submitted to NIH prior to receiving an award and must include other research support provided to the PI. Ruan did not include his relationship with HZAU in his discussion of other support. A review of annual reports submitted by JAX for this award, in which changes to other research support for the PI were required to be noted, similarly did not include Ruan's relationship with HZAU. JAX submitted these annual reports to NIH on February 13, 2015, and February 10, 2016.

31. In January 2015, JAX submitted an application for funding administered by the National Human Genome Research Institute, with Ruan as the PI. On August 31, 2015, JAX received a Notice of Award from NIH for the project, which was given project number NIH R25 HG007631. The project period was September 1, 2015, to June 30, 2018. Ruan's biographical sketch included in the application did not include information regarding his receipt of a China Thousand Talent Award or his ongoing relationship with HZAU. JAX submitted a Just-in-Time Report to NIH on June 22, 2015, and the discussion of Ruan's other support did not include his relationship with HZAU. The annual report JAX submitted on May 16, 2016, for this award likewise did not include Ruan's relationship with HZAU. The annual report JAX submitted on May 16, 2017, for this award did not include Ruan's relationship with either HZAU or SPH. In January 2018, JAX submitted a second application for NIH R25 HG007631 with Ruan as the PI. Ruan's biographical sketch included in the application simply noted that he was a recipient of a China Thousand Talent Award in the "Honors" section of his sketch but did not provide information on his ongoing relationship with HZAU.

32. In February 2015, JAX submitted an application for funding administered by the National Institutes of Diabetes and Digestive and Kidney Diseases, with Ruan as the PI. On September 14, 2015, JAX received a Notice of Award from NIH for the project, which was given project number NIH U54 DK107967. The project period was September 30, 2015, to July 31, 2020. Ruan's biographical sketch included in the application did not include information regarding his receipt of a China Thousand Talent Award or his relationship with HZAU. JAX submitted a Just-in-Time Time Report to NIH on September 21, 2015, and the discussion of Ruan's other support did not include his relationship with HZAU. The annual report submitted by JAX for this award on June 2, 2016, did not provide information on his relationship with

HZAU. The annual report submitted by JAX for this award on June 1, 2018, likewise did not provide information on his relationship with HZAU. In July 2018, JAX submitted a second application for funding with Ruan as the PI. Ruan's biographical sketch included in the application simply noted that he was a recipient of a China Thousand Talent Award in the "Honors" section of his sketch but did not provide information on his ongoing relationship with HZAU. The annual report submitted by JAX for this award on June 6, 2019, did not provide information on his relationship with either HZAU or SPH.

33.     In March 2016, JAX submitted an application for funding administered by the National Human Genome Research Institute, with Ruan as the PI. On August 24, 2017, JAX received a revised Notice of Award from NIH for the project, which was given project number NIH UM1 HG009409. The project period was February 1, 2017, to January 31, 2021. Ruan's biographical sketch included in the application simply noted that he was a recipient of a China Thousand Talent Award in the "Honors" section of his sketch but did not provide information on his ongoing relationship with HZAU. JAX submitted a Just-in-Time Report to NIH on January 9, 2017, and the discussion of Ruan's other support did not include his relationship with either HZAU or SPH. The annual report submitted by JAX for this award on December 8, 2017, did not provide information on his relationship with HZAU or SPH. The annual report submitted by JAX for this award on December 28, 2018, also did not provide information on his relationship with HZAU or SPH. The annual report submitted by JAX for this award on December 3, 2019, did not provide information on his relationship with HZAU but did note a foreign research collaboration agreement with SPH.

34.     In October 2019, JAX submitted an application for funding administered by the National Human Genome Research Institute, with Ruan as the PI. On August 5, 2020, JAX

received Notice of Award from NIH for the project, which was given project number NIH R01 HG011253. The project period was August 5, 2020, to May 31, 2024. Ruan's biographical sketch included in the application simply noted that he was a recipient of a China Thousand Talent Award in the "Honors" section of his sketch but did not provide information on his relationship with either HZAU or SPH. JAX submitted a Just-in-Time Report to NIH on July 24, 2020, and the discussion of Ruan's other support did not include his relationship with HZAU but did note a foreign research collaboration agreement with SPH.

## PRESERVATION REQUEST TO GOOGLE

35. On or about December 10, 2020, a preservation request under 18 U.S.C. § 2703(f) was submitted to Google, requesting the preservation of all information associated with **yijun.ruan@gmail.com** for a period of 90 days.

## BACKGROUND CONCERNING GOOGLE AND GMAIL

36. In my training and experience, I have learned that Google provides a variety of on-line services, including email access, to the public. Google allows subscribers to obtain email accounts at the domain name gmail.com, like **yijun.ruan@gmail.com**. Subscribers obtain an account by registering with Google. During the registration process, Google asks subscribers to provide basic personal information. Therefore, Google's computers are likely to contain stored electronic communications (including retrieved and un-retrieved email for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

37.     In my training and experience, Google subscribers can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by the provider. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

38.     In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location or illicit activities.

39.     In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the IP address used to register the account and the IP addresses associated with particular logins to the account. Because every

15

device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

40. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

41. As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

42. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the IP addresses from which users access the email account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators

16

can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## **CONCLUSION**

43.     As detailed above, I submit that probable cause exists to believe that Yijun Ruan has been affiliated with HZAU and SPH and has received, and possibly is continuing to receive, funding from these same entities during the time that he was also soliciting and receiving research grants from NIH. Ruan's close ties to these Chinese entities could have made him ineligible to receive grants issued by NIH. As detailed above, Ruan failed to disclose material information to JAX, thereby causing JAX to submit materially false grant applications, Just-in-Time reports and other documents to NIH via the internet. These interstate wire communications facilitated Ruan's scheme to defraud. Ruan's activities have violated both 18 U.S.C. § 1001(a)(1) (concealing a material fact in a matter within the jurisdiction of the United States government) and 18 U.S.C. § 1343 (wire fraud). Based on the forgoing, I request that the Court issue the proposed search warrant.

44. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Google. Because the warrant will be served on Google, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Christopher J. White
Special Agent
Federal Bureau of Investigation

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedure

Date: Dec 30 2020

City and state: Bangor, ME

Judge's signature

John C Nivison U.S. Magistrate Judge
Printed name and title

18